UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| DEBRA HALLMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 7:21-cv-1423-GMB |
| | ) | |
| THOMPSON TRACTOR | ) | |
| COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Debra Hallman filed a complaint against her former employer, Thompson Tractor Company, Inc. ("Thompson Tractor"), alleging disparate treatment in violation Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* Doc. 1.  The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 10.  Before the court is Thompson Tractor's Motion for Summary Judgment. Doc. 20.  The motion has been fully briefed (Docs. 21, 22, 24, 26 & 27) and is ripe for decision.  For the following reasons, Thompson Tractor's motion is due to be granted.

## I. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The purpose of summary judgment is to

separate real, genuine issues from those which are formal or pretended." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Indeed, the nonmovant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted).  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

When a district court considers a motion for summary judgment, it "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party and must resolve all reasonable doubts about the facts in favor of the nonmovant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted).  The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Ed. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted).  On the other hand, if the nonmovant "fails to adduce evidence which would be sufficient . . . to support a jury finding for [the nonmovant], summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

## II.  FACTUAL BACKGROUND

Thompson Tractor hired Hallman as a secretary in 1988. Doc. 22-6 at 53.  Her primary duties included answering phones, transferring calls, filing documents, preparing sales and rental contracts, maintaining files for the parts department, and typing correspondence. Doc. 24-1 at 17–18.  She remained in this position until her

termination on April 9, 2020. Doc. 22-6 at 52–53.  At all relevant times, Hallman reported to Kevin Jordan, Thompson Tractor's Parts Manager. Doc. 24-1 at 37 & 43; Doc. 24-3 at 12 & 19.

A.    **Hallman's Conduct**

Thompson Tractor has a four-step progressive discipline policy that begins with a verbal warning as the first step and a written warning as the second step. Doc. 22-6 at 19.  The third step is a final written warning, with termination as the fourth and final step. Doc. 22-6 at 19.

During her lengthy tenure with Thompson Tractor, Hallman's performance record was largely positive, and she received encouraging manager feedback in her Hourly Corporate and Performance Reviews for 2010 to 2016, 2018, and 2019. Doc. 22-6 at 55–124.  But Hallman's problems began in late March of 2020 when she had a conversation with a coworker in front of other coworkers and some of Thompson Tractor's customers. Doc. 24-1 at 127 & 129; Doc. 22-4 at 3.  Hallman confronted her coworker, Dana Madison, who had been out on leave and "said something about . . . [Hallman] being the only person in the office to answer phones for . . . two weeks." Doc. 24-1 at 127.  Madison explained that she was complying with Thomas Tractor's COVID-19 protocol, and Hallman responded, "Whatever." Doc. 24-1 at 127.  After the conversation, Madison called Jordan in tears. Doc. 22-4 at 3.

The next incident occurred on April 2, 2020, when Hallman answered a call from a customer who claimed he had a video recording of a Thompson Tractor service department technician stealing an item from his company. Doc. 24-1 at 131. Hallman tried to transfer the call to Jim Smith, the technician's supervisor, but either the call disconnected or Smith did not answer, so it rolled back to Hallman. Doc. 24-1 at 131–32.  Hallman told the customer she would find Smith, and just then heard him talking in Jordan's office. Doc. 24-1 at 132–33.  Because the office door was open, Hallman walked inside and asked Smith why he had not answered the call she forwarded to him. Doc. 24-1 at 133; Doc. 22-4 at 3.  She then explained that they had "a serious situation with a customer that said one of the technicians has . . . taken something." Doc. 24-1 at 132–33.  Smith took the call from the customer and said he would address the situation. Doc. 24-1 at 133.

Jordan met with Hallman the next day. Doc. 24-3 at 47–48; Doc. 24-8 at 2. Jordan began the meeting by stating, "I know you had a bad day yesterday, . . . [b]ut you can't be saying anything about COVID to anybody." Doc. 24-1 at 128.  When Hallman denied that she had talked about COVID in the office, Jordan reminded her of her conversation with Madison. Doc. 24-1 at 128.  Hallman responded that she "didn't care about that f***ing bitch." Doc. 24-1 at 129.  Hallman was frustrated with Jordan because he also had made comments in the office about Madison's COVID leave. Doc. 24-1 at 135.  Hallman explained that she thought Jordan was

using a double standard to judge her behavior, so she felt "more hostility toward him." Doc. 24-1 at 136.  During the conversation, Hallman raised her voice loud enough that everyone in the office—including a customer—could hear her even though Jordan's office door was closed. Doc. 24-1 at 128 & 138; Doc. 24-8 at 2. "To try to keep [the situation] from escalating, [Jordan] ask[ed] her to go home for the day because she was becoming very irate." Doc. 24-8 at 2.

**B.     Final Written Warning**

After his conversation with Hallman, Jordan spoke with Jason Long, the Director of Human Resources, who recommended that Jordan issue a final written warning under the company's progressive discipline policy. Doc. 24-8.   Jordan completed an Employee Corrective Action Form citing Hallman's conduct as the reason for the discipline. Doc. 24-8 at 2.  He categorized the action as a "final written warning/suspension," detailed the recent events, and cataloged her alleged misconduct:

> Argueing [sic] with Dana Madison that she had COVID-19 and not following protocall [sic].  I heard the same story from two people. Trying to whos [sic] is not doing their job by who is taking calls. [Interrupting] a meeting between myself and another supervisor and asking if he was just not wanting to answer calls[. S]he was very unprofessional.  I talked with Debra Friday morning 4/3/2020 about how we can handle the volume of calls coming in with so many people working from home and she would have to take messages and talked to her about [meddling] in other people[']s issues regarding their time off and she didn't respond to this very well.  My office door was closed and we had a customer in the office and she started yell[ing] and using

foul language so loud everyone in the office could [hear, ]including the customer.

Doc. 24-8 at 2.

On Monday, April 6, Hallman reported to work and met with Jordan. Doc. 24-1 at 37.  Jordan gave her the Employee Corrective Action Form and told her that he was placing her on a three-day suspension. Doc. 24-1 at 140.  She was suspended for three days without pay, beginning April 6 and ending April 9. Doc. 24-8 at 2. The Employee Corrective Action Form instructed Hallman to return "with [a] better attitude, controlling [her] outbursts, and being professional" and notified her that "[a]ny further outbursts will result in termination." Doc. 24-8 at 2.  Hallman refused to sign the Employee Corrective Action Form. Doc. 24-1 at 38.

## C.    Termination

During the week of April 6, Thompson Tractor's management team decided to use a reduction-in-force to respond to the economic downturn associated with the COVID-19 pandemic. Doc. 22-5 at 3.  Tim Madden, the Parts Operations Manager, Kyle Sims, the Vice President of Products Support, and Jason Long made the decision to include Hallman in the reduction-in-force because of the disciplinary issues Jordan had reported to Long. Doc. 22-5 at 2–3.  In the reduction-in-force, Thompson Tractor terminated fifteen employees—eleven men and four women. Doc. 22-5 at 4.  Thompson Tractor "included all fifteen employees in this headcount reduction due to what we felt were performance-related issues and communicated to

all fifteen employees that they were being terminated based on performance."
Doc. 22-5 at 4.

When Hallman returned from her suspension on April 9, Jordan called her
into his office and told her that she was terminated. Doc. 24-1 at 147; Doc. 24-8 at
4. Jordan said that her "behavior and work performance" were the reasons for her
termination. Doc. 24-1 at 147. Hallman asked if other people were going to be laid
off, and he explained that her termination "was because of the actions from
previously." Doc. 24-1 at 148. Hallman's termination letter, signed by Long, stated
that the termination was "based solely on your work performance."[1] Doc. 24-8 at 4.
No one mentioned a pandemic-related reduction-in-force to Hallman at the time.
Doc. 24-3 at 27.

**D.    EEOC Complaint and Response**

After her termination, Hallman filed a discrimination in employment
complaint with the Equal Employment Opportunity Commission.   Thompson
Tractor's response highlighted Hallman's inappropriate conversation about her co-
worker's COVID leave, her interruption of Jordan's meeting with Smith, and her
use of profanity, among other things. Doc. 24-7 at 2–4. The response also explained
that by April 2020 "the pandemic was creating a very difficult business environment

---

[1] Thompson Tractor defines performance "in terms of certain competencies, such as knowledge
and attitude, skills, habits, . . . [and] goals that are set between the manager and the employee,"
while good conduct consists of "behaviors" that align with its "standards of conduct policy" and
encourage "positive employee-manager-employer company relationships." Doc. 22-6 at 30–32.

across the country and the world" and "[t]he company took several steps to address the difficult business conditions, including reducing headcount by letting go employees who had performance problems.  Ms. Hallman was among sixteen employees who had performance issues who were let go on April 9, 2020." Doc. 24-7 at 4.

### III.  DISCUSSION

Hallman brings one claim for gender discrimination in violation of Title VII. Doc. 1 at 3–7.  Thompson Tractor moves for summary judgment on this claim, and summary judgment is due to be granted.

Under Title VII, "it [is] unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1288 (11th Cir. 2003) (quoting 42 U.S.C. § 2000e-2(a)(1)).  Generally, when a plaintiff asserts a Title VII gender discrimination claim based on circumstantial evidence, the court applies the framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).  Here, Hallman does not rely on the familiar *McDonnell Douglas* framework in attempting to prove her claim of discrimination. Doc. 24 at 10–11; Doc. 27 at 3–4.  Instead, she travels under the convincing mosaic of discrimination and mixed-motive theories. Doc. 24

at 11–23; Doc. 27 at 3–4.  The court will take up these two theories in turn.

## A.   Convincing Mosaic

As the parties acknowledge, the *McDonnell Douglas* framework is not the only way for claims to survive summary judgment in a discrimination case. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  Rather, "[t]he plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id*.  A triable issue of fact exists when the record, viewed in a light most favorable to the plaintiff, presents a "convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker. *Id.*; *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012).

A plaintiff establishes a convincing mosaic when the summary judgment evidence demonstrates "(1) suspicious timing, ambiguous statements. . . , and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019) (citation and internal quotation marks omitted). Additionally, courts look to evidence that "(1) cast[s] doubt that the employer's reasons were not what actually motivated the conduct, (2) show[s] that the employer's articulated reason is false and hid discrimination, or (3) establish[es] that

the employer has failed to clearly articulate and follow its formal policies." *Lennon v. Ala. Telecasters, Inc*., 2021 WL 1554892 at *1 & *9 (M.D. Ala. 2021) (citing *Lewis*, 934 F.3d at 1186).   The convincing mosaic analysis, in short, "asks whether the plaintiff 'presents evidence that creates a triable issue concerning the employer's discriminatory intent.'" *Lennon*, 2021 WL 1554892 at *8 (quoting *Lockheed*, 644 F.3d at 1328).   To answer this question, the court "is left to put all the pieces of the Plaintiff's circumstantial evidence in a pile and determine if there is enough so that a reasonable fact finder could assemble a mosaic of intentional discrimination." *Id*.

For example, in *Smith*, 644 F.3d at 1336, the Eleventh Circuit found sufficient evidence of a convincing mosaic of race discrimination to vacate the district court's grant of summary judgment.   The *Smith* plaintiff presented evidence of a decision matrix for disciplinary decisions that used an employee's race as a "key consideration." *Id.*   He also established that his employer "had a substantial incentive to discipline white employees more harshly than black employees," "consciously injected race considerations into its discipline decision making without an adequate explanation for doing so," and fired four white employees when two black employees were disciplined more leniently for "virtually identical" conduct. *Id*. at 1341.

Hallman's evidence here is not comparable.   She points to the following facts to support a convincing mosaic: (1) allegedly inconsistent and unlikely reasons for

her termination, (2) noncompliance with Thompson Tractor's progressive disciplinary policy, (3) systemic better treatment of men than women, and (4) suspicious timing. Doc. 24 at 12–20.  This evidence falls short of proving intentional discrimination on the basis of Hallman's gender.

First, Hallman has not shown that Thompson Tractor's expressed reasons for her termination were inconsistent, unlikely, or dishonest. Doc. 24 at 12–16, 19–20. Instead, the only reasonable inference from the record is that the reasons given for her termination all relate to her behavior at work during late March and early April of 2020.  That her termination was accomplished during a reduction-in-force does not change this fact.  Hallman may cast doubt on the claim that the pandemic influenced her termination decision (Doc. 24 at 13), but her skepticism is not evidence, and she has not contradicted Thompson Tractor's proof that it imposed a reduction-in-force and terminated other employees on the same day for performance problems.  And while Hallman focuses on the perceived daylight between "conduct" and "performance," these semantics do not show inconsistent reasons for her termination.  Regardless of the precise terms used to convey its discipline decisions, the record reflects that Thompson Tractor consistently explained that Hallman's termination was the result of her work-related misconduct.

Second, Hallman is correct to claim that Thompson Tractor did not follow its four-step progressive discipline policy when it skipped step two of the policy by

failing to administer an initial written warning before her final written warning. Doc. 22-6 at 19; Doc. 24-8.[2]  This failure carries little weight, however, when viewing Hallman's termination in the context of a reduction-in-force.  Hallman's actions led to the decision to include her in the reduction-in-force, not to terminate her as the culmination of the progressive discipline policy.  More importantly, nothing about the discipline policy or its application tends to show that Thompson Tractor discriminated against Hallman because she is a woman, which is the relevant consideration for her Title VII claim.

Hallman also argues that men received better treatment in Thompson Tractor's male-dominated workplace. Doc. 24 at 17–18.  But none of her evidence on this point establishes systemic preferential treatment based on gender.  Hallman highlights three facts here: employees playing cards or football in the office, comments minimizing her role as a secretary or cashier, and the common use of profanity in conversation.[3] Doc. 24-3 at 37, 38–39 & 42; Doc. 24-1 at 181.  While

---

[2] As described above, Thompson Tractor has a four-step progressive discipline policy: (1) verbal warning, (2) written warning, (3) final written warning, and (4) termination. Doc. 24-8 at 2.  On April 3, 2020, Jordan met with Hallman about her conduct the day before. Doc. 24-3 at 47–48.  Although it was not formally documented as such, the court construes that meeting as a verbal warning under the discipline policy.  On April 6, Jordan gave Hallman a final written warning. Doc. 24-8 at 2.  Finally, on April 9, Thompson Tractor terminated Hallman's employment. Doc. 24-8 at 4.  The record does not reflect a documented written warning at step two of the four-step progressive discipline policy.

[3] Hallman points to other employees' use of profanity in conversation with a supervisor or in the presence of a supervisor without reprimand.  For example, she testified that the use of profanity at Thompson Tractor was common, especially at the parts counter, and that her coworkers used profanity in conversations with supervisors, including Jordan. Doc. 24-1 at 51−53 & 57; Doc. 24-3 at 32–33.  However, those instances are not similar to her April 3 conversation with Jordan, when

this evidence might establish some unprofessional behavior at work, it does not show systemic preferential treatment based on gender.

Finally, the timing of Hallman's termination does not support a reasonable inference of gender discrimination. Hallman argues that she was suspended and then terminated only after a confrontation with a male coworker. Doc. 24 at 19. While that confrontation did play a role in her discipline, Jordan reprimanded her for a series of events that occurred within a short time, and her termination came a few days later and immediately after she returned from a formal suspension for that conduct. Nothing about this timing indicates that Hallman's gender was the reason for her termination.

Ultimately, it is not the court's job to decide whether an employment decision is fair or wise, but only whether it is legal. *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). To succeed, Hallman must come forward with enough evidence for a reasonable juror to infer that Thompson Tractor intentionally discriminated against her because she is a woman. *Lockheed*, 644 F.3d at 1328. She has not done so.

---

Hallman admits to raising her voice and cursing about a coworker. Doc. 24-1 at 128 & 138. When other workers used profanity in conversation with one another or a supervisor, the testimony establishes that these were casual conversations, not responses to a supervisor's reprimand for misconduct. Doc. 24-1 at 63–67; Doc. 24-9 at 32–33, 39–41.

**B.** **Mixed-Motive Analysis[4]**

Alternatively, a Title VII claim may survive summary judgment "where both legitimate and illegitimate reasons motivated the decision." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 93 (2003); *Quigg v. Thomas County Sch. Distr.*, 814 F.3d 1227, 1239 (11th Cir. 2016). Where a plaintiff alleges a mixed-motive claim, the court must "decide whether the plaintiff 'has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [her protected characteristic] was a motivating factor for [an] adverse employment decision.'" *Williams v. Dep't of Corr.*, 477 F. Supp. 3d 1236, 1250 (N.D. Ala. 2020) (quoting *Quigg*, 814 F.3d at 1239). Specifically, the court should assess whether "(1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was a motivating factor for the defendant's adverse employment action." *Quigg*, 814 F.3d at 1239 (citation omitted). The second element requires Hallman to show that she would not have been terminated if not for her gender. *See Lewis v. Metro. Atlanta Rapid Transit Auth.*, 343 F. App'x 450,

---

[4] Thompson Tractor argues that Hallman waived her mixed-motive claim because she did not affirmatively plead it in her complaint. Doc. 27 at 10−11. Decisions on waiver in this context have varied. *See, e.g.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 247 n.12 (1989), *superseded by statute on other grounds as recognized by Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1017 (2020) ("Nothing in this opinion should be taken to suggest that a case must be correctly labeled as either a 'pretext' case or a 'mixed-motives' case from the beginning in the District Court."); *Robinson v. Alexander City*, 2021 WL 4134054, at *6 (M.D. Ala. 2021) (finding waiver where the plaintiff did not plead a mixed-motive claim or put the defendants on notice during the discovery process of a claim under that theory). The court does not reach the question of waiver because Hallman's mixed-motive claim fails on its merits.

455 (11th Cir. 2009).

In support of her mixed-motive claim, Hallman generally cites to her convincing mosaic evidence, including the purportedly inconsistent reasons for her termination, noncompliance with the progressive discipline policy, male-dominated work environment, and timing of her termination. Doc. 24 at 21–22.  As explained above, this evidence does not establish that gender was a motivating factor in the decision to terminate Hallman's employment.  This failure of proof is fatal to her mixed-motive claim as well.

## IV.  CONCLUSION

For these reasons, Thompson Tractor Company Inc.'s Motion for Summary Judgment (Doc. 20) is due to be granted.  A final order will be entered.

DONE and ORDERED on January 24, 2023.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE